(90 South. 840)

No. 22929.

## SCOTT v. VICKSBURG, S. & P. RY. CO.

(Jan. 30, 1922.)

*(Syllabus by the Court.)*

Carriers ☞287(4), 303(6), 328(1), 333(1), 339—Carrier's duty as to furnishing step box stated; carrier is not an insurer against passenger's negligence in using step box; injuries to passenger using step box without looking attributable to his misuse of appliance.

Where a carrier of passengers furnishes a step box to facilitate them in boarding or alighting from its trains, it is bound to see that such appliance is safe as to strength, is so constructed as not to be readily overturned, is kept in proper condition, and, when set out for the use of the passengers, is placed upon a level and stable surface; but the carrier is not the insurer of the passenger against the consequences of his own negligence, and where the passenger is injured in attempting to use such appliance without looking at it, and stumbles over or against it when he should have stepped on it, his injuries are attributable to his misuse of the appliance and not to its inadequacy, and the carrier is not liable for the injuries.

Appeal from Sixth Judicial District Court, Parish of Ouachita; Ben C. Dawkins, Judge.

Action by Eugene Scott against the Vicksburg, Shreveport & Pacific Railway Company. Judgment for plaintiff, and defendant appeals, and plaintiff answers, praying for increase in award. Judgment appealed from set aside, plaintiff's demand rejected, and suit dismissed at plaintiff's cost.

Stubbs, Theus, Grisham & Thompson, of Monroe, for appellant.

John M. Munholland, of Monroe, for appellee.

BAKER, J. An opinion prepared in this case by the late Chief Justice was not finally passed on, owing to the change in the composition of the court, and the case was reset for argument, and has been reargued and resubmitted. As the said opinion covers the case completely, and appears to be correct, we now adopt it as that of the court. It is as follows:

Plaintiff claims $5,000 as damages for personal injuries alleged to have been sustained through the negligence of defendant and its agents, and, having obtained judgment for $1,500, defendant has appealed and he (plaintiff) has answered, praying that the amount of the award be increased to that claimed. The circumstances under which the injuries are said to have been sustained and the particular negligence to which they are attributed are set forth in the petition, as follows:

"And that on the 17th day of November, 1914, your petitioner bought one first-class ticket from Delhi * * * to Monroe, * * * and proceeded to the passenger depot * * * in Delhi * * * for the purpose of entering the west-bound train, due about 5 or 6 o'clock p. m.; * * * that it was dark and the depot grounds were insufficiently lighted; that a lot of empty box cars were standing between the depot and the place where the forward end of the day coach stopped for the purpose of putting off and taking on passengers; that * * *. petitioner was present at the time the passenger train * * * came into said station, and took a position within a few feet of the front platform of the day coach, * * * awaiting his time and the invitation * * * to enter; * * * that, after the passengers had gotten off the train the flagman * * * called, 'All aboard,' and * * * petitioner, standing close to said platform, proceeded to step upon the step box and * * * thence to the step of the platform of the said * * * coach, and in so doing put his left foot upon the train box, caught the left handhold on the corner of the platform, and, as he threw his weight on his left foot on the aforesaid box, he felt it slip and give way under his foot, and while bringing his right foot up it hung under the cover of the box, at which juncture and while in this predicament he was unlawfully and negligently interfered with by the flagman, and as he reached for the handrail on the corner of the coach with his right hand, but before he could grasp it, the flagman forcibly shoved him on his right elbow, at which juncture, and by reason of the insecurity of the step box and the interference of the flagman, your petitioner was forcibly thrown to the ground, by which

fall he was rendered unconscious, and did not regain consciousness until carried home."

He then describes his sufferings and the results of his injuries and proceeds as follows:

"That all of this is due to the wanton and willful negligence of the defendant in not providing a safe and suitable means of ingress and egress into (and out of) said passenger coach, and to the wanton, willful, and negligent interference by the servants and employees of the defendant, particularly the flagman of the train, at the time in question, in interfering with and preventing him from getting into said train."

Bearing in mind that plaintiff was .attempting to enter upon said front platform of the day coach from the south side, and that the rear platform of the "smoker" was coupled thereto on the left, or west, side, the three persons who were in better positions to see how the accident complained of occurred were: (1) The flagman, who stood immediately upon plaintiff's right side, facing him, as he attempted to board the car, and holding a lighted lantern in his hand; (2) M. Kaliski, a passenger on the train, who had come out of the smoker with the expectation of meeting, or seeing, some one with whom he had an appointment, and who (Kaliski) was standing on the bottom step of the rear platform of the smoker, also facing plaintiff; (3) and W. C. Carpenter, a disinterested person, who had never been in the employ of a railroad company, and who, intending to board the train, was immediately behind the plaintiff waiting to move forward as he moved.

At the date of the trial, which was some 16 months after the accident, the flagman testified that he had been discharged by the railroad company about five months prior to that time (because of a difficulty with a passenger); that he was then engaged in farming; that he was done with railroading; and that he had no interest in the suit.

He further testified, in part, as follows:

"When the train stopped at Delhi—after I had discharged all my passengers—got off at Delhi—after all had gotten on that I thought were going to get on, * * * I hollered, 'All aboard,' and Mr. Scott started towards the train, and as he attempted to step up on the train stool he fell backwards in Mr. Carpenter's arms, I would say—and they laid him on the ground and sent for a doctor and I remember hearing the doctor say" (objection).

The witness went on to say that the plaintiff cried out "O Lord," while lying on the ground, and that he did not know what was the matter with him; that he thought perhaps he had heart failure or was drunk; that plaintiff raised his foot to step on the "step stool," and was attempting to catch the handhold, but that his foot did not touch the stool and his hand did not touch the handhold; he simply fell backwards to the ground, against or into the arms of Carpenter, who was behind him; that he (witness), "just like anybody would," caught at him as he fell, but did not reach him.

Carpenter's testimony reads, in part,

"We were going on the train, and I was going to get on right behind him. * * * Well, he started to get on it and the flagman says, 'All aboard,' and started to get on—and the first thing I knew, Mr. Scott fell back against me, and, of course, I grabbed—both hands—just like anybody else would do, and eased him, behind, the best I could—he got a pretty good fall and I don't remember hurting anything—like that—but his head struck me right there—in the chest—and, of course, I grabbed with both hands—that was to steady him and ease him down. * * * He (the flagman) was on the east side * * * facing the steps. * * * I don't know whether he touched Scott or not."

He testified further that he does not know whether Scott's foot touched the step box or not; it was all so unexpected to him; and he did not know what Scott was doing with his foot. The allegations of the petition that we have quoted were then read to the witness, and he was asked what he knew of the flagman having done what he is there charged with doing, and his reply was, "I never seen any of it;" he never saw Scott

take hold of anything; the first thing that he knew was Scott's falling back against him.

Kaliski testified that he was standing on the lower step of the adjoining platform (being the rear platform of the smoker); that he saw Scott come up, and that he made two attempts to get up on the box, and fell back and some one seemed to catch him; that he never got his foot on the step box; that he (witness) is inspector of watches for the railroad company. Another witness called by defendant (its agent at a nearby station) was about taking the train and professes to have witnessed the accident. We understand him to say that plaintiff stepped on the box and seemed to give way in the knees, and when he did "he just fell right back."

Plaintiff called in rebuttal the proprietor of the livery stable, who "meets all the trains," and he testified that he was standing perhaps ten feet back from the scene of the accident, and that plaintiff walked by him hurriedly and started to get on the train, and that he "fell off backwards"; that, as near as he could tell, plaintiff had one foot on the stool and one foot on the car step, and had hold of the two rods, and that he came off backwards. Witness was looking right at him and did not see the flagman touch him; that the way it struck him was, "There is a man with heart failure," though he had never seen a man afflicted with that complaint.

Plaintiff also called in rebuttal two negroes who profess to have witnessed the accident from a distance of 15 feet. One of them (Perkins) testified that plaintiff "put his foot on the box—left foot; * * * he aimed to stand up"; and the next thing witness saw him fall. The other witness (Johnson) said:

"When he aimed to get on the train—stepped on the box there—and as he aimed to make the next step, he fell. * * * He fell from the box."

Witness had no difficulty in seeing the box and also plaintiff's feet, and eventually testified that he saw the box "turned over." Thus we find the following:

"A. It was light enough for me to see the box—it was after dark then, but I saw the box and his foot.

"Q. The box never turned over?

"A. Yes, sir; I think it must have turned over.

"Q. Did you see it turn over?

"A. No; but from the cause there—the way it fell, it must have turned over.

"Q. Did you see that box turn over?

"A. When he made the step there—put his foot on the box—you see, and aimed to catch up there—the box querled over and he fell—why they come around the box, and I couldn't just see whether the box was all turned over there, after he fell.

"Q. Say Yes or No, whether the step box turned over.

"A. Yes; it turned over.

"Q. Did you see it?

"A. Yes, sir; I saw it turned over."

Other testimony we find conclusive to the effect that the box was neither turned over nor "querled over." The box that was offered in evidence, and which is shown to be the same type as that to which the testimony relates, measures 12 by 16 inches at the bottom, 10½ by 14½ at the top, and is 10 inches high. Every one who has ever had occasion to travel on a railroad train knows the type and knows that the boxes are not readily turned over. It is shown, too, that the cinder surface upon which the box in question rested was smooth and hard, that the same arrangement had existed for years, and that no accident had ever happened because of it. The testimony is also conclusive to the effect that the light was quite sufficient for all purposes for which light was there needed. Dr. Barrier, who was the first physician to see plaintiff after the accident, and who was called to the stand by plaintiff, so testifies, saying, however, that a careful examina-

tion of plaintiff, which was made within an hour or two, required more light. He also testifies, as do other physicians who participated in that examination, that plaintiff's person showed no visible sign of injury and that no bones were broken, though he complained of great pain in his back, hip, and head, was in a semiconscious condition when carried to his home, and was there confined for 10 or 12 days after the accident. Dr. Barrier also testified that he weighs 340 pounds; that he had been getting on and off the train at Delhi, with the aid of step boxes such as that here in question, for 24 years, and has met with no accident; that he came into Delhi on the train upon which plaintiff was attempting to go in; that he found no change in any of the conditions on the day of the accident; and that, in effect, was the testimony of the plaintiff himself with respect to a period of 20 years or more.

Plaintiff's version of the accident, as it appears in his testimony, is as follows (we quote the testimony as we find it in the record, and have no means of knowing whether its rather jerky appearance is attributable to the witness or the stenographer):

"A. After the train came in, I was walking around, ahead of my son—along with him—and I remember—he was a little bit ahead of me—I was telling him what to do (about some of his business) and he followed me to the step box, and I stepped up with my left foot on the box, and it gave, and I caught the rail with my left hand—the rail on the train on the west side of the steps, and when the box kind of gave—as I was going on up—with the weight —why—and jerked, the front foot kind of caught in the floor of the box—extension of the top of the box—and I had on a heavy pair of solid shoes—the sole extended out a little bit—and as I went to reach for it—the other handbar of the coach was—why—this flagman struck my elbow there and knocked it off, and if it hadn't been for that I would have caught my hold. I can't say that he did this—shoved me, or knocked me, or anything of that kind—but, at the same time, I thought he was doing it to assist me on the train. * * *

"Q. At the time the flagman's hand touched, as you say, your elbow, you had already lost your balance and (upon your ability to catch the right handhold depended your escape from the fall, didn't it?

"A. My foot had hung under the box at the time when I was reaching for the handhold, when he struck my arm."

A little further on in his testimony he says: ·

"I had lost my balance before my right foot had struck the box—had caused me to—with the left foot in trying to catch myself—then my right foot struck under the extension of the top and then it threw me right over.

"Q. You had, as I understand, then, already lost your balance before you caught your foot under this extension of the box?

"A. I had not lost my balance before the box had given. And in order to get my foot— I caught hold—then my right foot caught under the step. * * *

"Q. Is it not a fact, Mr. Scott, that, as a result of the condition which you describe as being due to the fact that the step box gave way under you, you had already lost your balance?

"A. To some extent; yes, sir. * * * Not enough, I don't think, but what I could have saved myself by catching with the handrail."

Further along still plaintiff was questioned about the light around the depot and seems to have found no fault with it, and then we have the following:

"Q. Could you see the step box?

"A. I never noticed—when it—I just slipped my foot on it.

"Q. How did you know where it was, if you could not see it?

"A. I knew about where it was; I knew where it ought to be.

"Q. Did you look to see where it was?

"A. I really don't know, Mr. Stubbs, whether I looked down at the box; I suppose I did.

"Q. You don't remember whether you looked at the box or not?

"A. I was bound to have looked at it, or I would not have found it.

"Q. If you looked at it, did you see it?

"A. I guess so; I felt it though, I know.

"Q. Could you see the steps there?

"A. Yes, sir."

### Opinion.

It will be observed that the petition alleges that plaintiff "was present at the time

the passenger train * * * came into said station, and took a position within a few feet of the front platform of the day coach," etc., but that he says in his testimony: "After the train came in, I was walking around, ahead of my son; * * * I remember that he was a little bit behind me—I was telling him what to do—and he followed me up to the step box, and I stepped up," etc. His witness Patterson testifies that plaintiff passed him "hurriedly." Plaintiff himself further testifies, in effect, that he attempted to put his foot on the box without looking to see where it was, that he knew about where it was, and that he knew that he felt it.

The evidence leaves no question as to the sufficiency of the light or as to the irrelevancy of the allegations as to the box cars, nor as to the condition of the step box or of the cinder surface upon which it rested. Plaintiff testifies that the flagman touched or knocked his elbow, but admits that impression made upon him at that moment when he had lost, and was trying to recover, his balance. The testimony to the effect that he did get on the step box finds corroboration in the manner in which he fell, to the extent that it seems unlikely that a person merely moving forward upon a level surface will suddenly fall backwards, and, in this instance, not unlikely that plaintiff may have so put his foot upon the box, with his eyes and thoughts directed to his son, who was behind him, as to bring his weight to bear upon it at some angle less than 45 degrees, with the result that the box was pushed forward, with his foot following faster than his body, destroying his equilibrium and throwing him backwards; but, even if that were proved satisfactorily, it would merely establish a misuse by plaintiff of the appliance furnished by defendant, and would not affect the question of the adequacy of the appliance.

As to the law of the case, we are of the opinion that, where a carrier of passengers furnishes a step box or footstool, to facilitate them in boarding or alighting from its train, it is bound to see that such appliance is safe as to strength, is so constructed as not to be readily overturned, is kept in proper condition, and when set out for use of passengers is placed upon a level and stable surface; but that the carrier is not the insurer of the passenger against the consequences of his own negligence, and where, as here, the passenger is injured in attempting to use such an appliance, without looking at it, and stumbles over or against it when he should have stepped on it, his injuries are attributable to the misuse of the appliances and not to any defects or inadequacy in the box or in its surroundings, and the carrier is not liable for his injuries.

The judgment appealed from is set aside, and plaintiff's demands are rejected, and this suit is dismissed, at his cost.